FOR PUBLICATION

## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| COLLEEN CLARKE, EVELYN BASCOMBE, )<br>SHALIMA EDWARDS, LAWRENCE LIBURD,)<br>JAMES WILSON, PATRICIA OLIVER, )<br>DELORES CRICHLOW, MARY )<br>RICHARDSON, EPIPHANE JOSEPH and )<br>PHYLLIS NEHLSEN, )<br>)<br>     **Plaintiffs,** )<br>**v.** )<br>)<br>RUPERT W. ROSS JR., in his Official Capacity )<br>as CHAIRMAN OF THE ST. CROIX )<br>DISTRICT BOARD OF ELECTIONS, and )<br>THE ST. CROIX BOARD OF ELECTIONS, )<br>)<br>     **Defendants.** )<br>_____ ) | **Civil Action No. 2012-014** |

**Attorneys:**
**Yohana Manning, Esq.,**
St. Croix, USVI
    *For the Plaintiffs*

**Scot F. McChain, Esq.,**
St. Croix, USVI
    *For the Defendants*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER presents a dispute over the threshold number of signatures required by section 12(c)(3) of the Revised Organic Act, 48 U.S.C. § 1593(c)(3), to trigger a recall election for certain elected members of Defendant St. Croix District Board of Elections. Presently before the Court are the parties' dispositive motions: 1) Plaintiffs' Motion for Judgment on the Pleadings, filed on May 10, 2012 (Dkt. No. 66); 2) Plaintiffs' Motion to Strike Affirmative Defenses and Counterclaim, filed on May 10, 2012 (Dkt. No. 67); 3) Plaintiffs' Motion to Dismiss Defendants' Counterclaim, filed on May 14, 2012 (Dkt. No. 70); 4) Plaintiffs' Motion

for Summary Judgment, filed on June 11, 2012 (Dkt. No. 107); and 5) Defendants' Motion for Summary Judgment, filed on June 11, 2012 (Dkt. No. 104).  The parties argued these motions at a hearing held on June 29, 2012.[1]  For the reasons discussed below, the Court finds that Plaintiffs did not collect the number of signatures required by section 12(c)(3) of the Revised Organic Act to trigger a recall election for the Board of Elections members whose recall is sought in this lawsuit.  The Court will therefore enter summary judgment in favor of Defendants and dismiss Plaintiffs' claims.

## I.   <u>BACKGROUND</u>

On or about January 12, 2012, the Virgin Islands Supervisor of Elections, John Abramson, Jr., ("Supervisor of Elections") received recall petitions from Plaintiff Colleen Clarke, pertaining to the recall of six members of the St. Croix District Board of Elections ("Board of Elections" or "Board")—Defendant Rupert W. Ross, Jr. ("Ross"), Raymond J. Williams ("Williams"), Ana L. Davila ("Davila"), Carmen Golden ("Golden"), Dodson K. James ("James"), and Lisa Harris-Moorhead, Esq. ("Harris-Moorhead"). (*See* Recall Petitions, Dkt. No. 110-3).  On January 17, 2012, the Supervisor of Elections replied to Ms. Clarke stating that, pursuant to section 12(c)(3) of the Revised Organic Act, the "sponsors" of the recall petitions had sixty days from January 12, 2012, or up to and including March 12, 2012, within which to submit "signatures equal in number to at least 50 percent of the whole number of votes cast for

---

[1]     Due to the expedited time frame within which this matter was litigated (*see* Dkt. No. 63), and the overlapping nature of the arguments presented, the Court exercised its discretion to hear and consider all of the motions together (*see* Dkt. No. 79).

that office in the last general election at which that office was filled." (January 17, 2012 Letter, Dkt. No. 109-9).[2]

Regarding the number of signatures required to trigger a recall election of Ross and Williams, who were elected in 2010, the letter stated:

> Pursuant to the Certification for the St. Croix District Board of Elections dated November 17, 2010 and forwarded to the Office of the Supervisor of Elections[,] a total of 22,984 votes were casted [sic] for that office in the last general election at which that office was filled.  At least 50 percent of the whole number of votes cast for that office would represent 11,492 signatures.

*Id.*  Regarding Davila, Golden, James and Harris-Moorhead, who were elected in 2008, the letter stated:

> Pursuant to the Certification for the St. Croix District Board of Elections dated November 18, 2008 and forwarded to the Office of the Supervisor of Elections[,] a total of 17,982 votes were casted [sic] for that office in the last general election at which that office was filled.  At least 50 percent of the whole number of votes cast for that office would represent 8,991 signatures.

*Id.* at 2.

On January 25, 2012, Plaintiff Clarke sent a letter to Defendant Ross, Chairman of the Board of Elections, questioning the Supervisor of Elections' determination of the signature thresholds required to trigger recall elections for the six board members.  (*See* January 25, 2012 Letter, Dkt. No. 32-6).  Plaintiff Clarke asked Defendant Ross to provide the position of the Board of Elections regarding the necessary signature thresholds and the legal authority for such position.  *Id*.

On January 30, 2012, Defendant Ross sent a letter to the Attorney General of the Virgin Islands with a copy of Plaintiff Clarke's letter, requesting that the Attorney General "advise

_____

[2]      Section 12 of the Revised Organic Act, 48 U.S.C. § 1593, is the federal statute that authorizes recall elections in the United States Virgin Islands.

whether the Board has a role to play in this recall verification process." (*See* January 30, 2012 Letter to the Attorney General, Dkt. No. 32-7). Plaintiff Clarke was copied on this letter. *Id*. Defendant Ross also sent Plaintiff Clarke a letter acknowledging receipt of her letter and informing her that he had "sought the advice of the Attorney General whether the Board has a role to play in the recall verification process," and would share the response once received. (*See* January 30, 2012 Letter to Plaintiff Clarke, Dkt. No. 1-7).

On February 7, 2012, Plaintiffs filed a Complaint with this Court against the Supervisor of Elections, the Board of Elections, and Ross, alleging that the Supervisor of Elections' signature threshold determination, as indicated in his January 17, 2012 letter, embodied an incorrect interpretation of the applicable law. (Complaint, Dkt. No. 1). The Complaint sought a declaratory judgment "that the correct number of signatures to meet the necessary threshold for a successful recall . . . is actually 50% of the whole number of votes cast for the elected official that is being recalled from the office of the Board of Elections, pursuant to §12(c)(3) of the Revised Organic Act of 1954." *Id*. at 4.

On or about March 12, 2012, Plaintiffs presented recall petitions with a list of signatures to the Supervisor of Elections. (*See* Abramson Dep. Tr. at 36, Dkt. No. 118-1; Dkt. No. 109-9). As later determined by the Supervisor of Elections, the recall petitions contained valid signatures totaling 2,379 in support of a recall election for Davila; 2,385 for Golden; 2,446 for Harris-Moorhead; 2,415 for James; 2,452 for Ross; and 2,427 for Williams. (Summary of Recall Petitions, Dkt. No. 109-4 at 2).

By letter dated March 27, 2012, the Attorney General responded to the January 30, 2012 letter sent by Defendant Ross inquiring about the Board's role in the recall process. (March 27,

2012 Letter, Dkt. No. 32-10).  Regarding the Board of Elections' "role" in the "recall verification process," the letter explained:

> The extent of the Board's role is to monitor the activities of the Supervisor of Elections as he determines whether the minimum signature threshold is met, pursuant to §12(c)(4).  This role coincides with Section 4 of Title 18 in the Virgin Islands Code, which states that the Supervisor of Elections is subject to the direction, control, and supervision of the Boards of Elections.

*Id*. at 2.  The letter also included the Attorney General's opinion on the requisite number of signatures required to trigger a recall election:

> The number of signatures required on a petition for recall is easily calculable when a single office is at issue, such as for the Office of the Governor, for instance.  However, when there are several candidates running for several "seats" or "offices" the language is reasonably susceptible to more than one meaning . . . .  In deciding this issue, [] several principles of statutory construction . . . are particularly relevant . . . [including] a literal meaning of a statute should be rejected if it would lead to absurd results . . . [and] exceptions which would avoid results of an absurd character will always be presumed as intended by the legislature . . . .  Therefore, the term "office" must be construed to mean a position of authority and thus refer to one official, in order to avoid the unreasonable result of requiring more signatures on a petition than there were votes cast for that individual.  So, if the total number of votes cast for the Board member being recalled was 6,188 then the number of signatures needed would be 3,094.

*Id*. at 3. [3]

Relying on the advice of the Attorney General that the threshold number of signatures required to trigger a recall election pursuant to section 12(c)(3) of the Revised Organic Act is 50% of the votes cast for the elected official whose recall is being sought, on March 27, 2012, the Supervisor of Elections certified that the minimum number of signatures to trigger a recall election had been met for Board members Davila, Golden, James and Harris-Moorhead.  (*See* March 27, 2012 Letter, Dkt. No. 109-3; Summary of Recall Petitions, Dkt. No. 109-4 at 2;

---

[3]     At his deposition, the Supervisor of Elections testified that he was given the same advice by the Attorney General at a meeting on the evening of March 26, 2012.  (Abramson Dep. Tr. at 25, 35, Dkt. No. 109-1).

Abramson Dep. Tr. at 33-34, Dkt. No. 109-1; Pls.' St. of Undisputed Facts at ¶ 5, Dkt. No. 107; Defs.' Resp. to Pls.' St. of Undisputed Facts at ¶ 5, Dkt. No. 119).[4]

On April 4, 2012, the Board of Elections held its "regular monthly meeting." (Ross Dep. Tr. at 26, Dkt. No. 90-1).[5]   During that meeting, members of the Board discussed the certification of the recall petitions by the Supervisor of Elections.  *Id*. at 32-33.  Williams made a motion that the "[B]oard was not in agreement with the action of the [S]upervisor [of Elections]."  *Id*. at 30.  That motion was seconded by Davila.  *Id*.  By a 2-1 vote, with the four members of the Board who were the subject of the recall petitions abstaining, the Board of Elections voted to overturn the Supervisor of Elections' certification of the recall petitions. *Id.* at 34-35.

On April 17, 2012, Plaintiffs filed an Amended Complaint against the Supervisor of Elections, Defendant Ross, and the Board of Elections. (Dkt. No. 32).  The Amended Complaint seeks, *inter alia*, an injunction requiring the Board of Elections to set a date for a recall election for Board members Davila, Golden, James, and Harris-Moorhead. *Id*.[6]

On May 7, 2012, Defendants Ross and the Board of Elections answered the Amended Complaint, lodging several affirmative defenses and a counterclaim against Plaintiffs.  (Dkt. No.

---

[4]      Board members Davila, Golden, James and Harris-Moorhead had been elected to office in 2008 with 3,553, 3,678, 4,247, and 3,086 votes, respectively.  (Dkt. No. 32-5 at 2). The number of recall petition signatures collected for each was 2,374, 2,385, 2,415, and 2,446 respectively.  (Summary of Recall Petitions, Dkt. No. 109-4 at 2).

[5]      According to Ross, the Board of Elections holds a meeting on the first Wednesday of every month.  (Ross Dep. Tr. at 26, Dkt. No. 90-1).

[6]      At the June 1, 2012 status conference in this matter, Plaintiffs stated that, because the Supervisor of Elections had certified that the recall petitions contained sufficient signatures, there was no longer a case or controversy between him and the Plaintiffs, and they would therefore dismiss the Supervisor of Elections from the lawsuit.  Consistent with that statement, on June 8, 2012, the parties filed a stipulation pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), dismissing the Supervisor of Elections from the lawsuit.  (Dkt. No. 103).

61).  The gist of the affirmative defenses and counterclaim is that: 1) the number of signatures required to trigger a recall election advocated by Plaintiffs, the Supervisor of Elections, and the Attorney General is incorrect; and 2) Plaintiffs' signature collection efforts were rife with fraud, misrepresentations, and other irregularities, rendering the signatures void. *Id*.[7]

## II.   SUMMARY JUDGMENT LEGAL STANDARD

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Nicini v. Morra*, 212 F.3d 798, 805-806 (3d Cir. 2000) (en banc); *see also* Fed. R. Civ. P. 56(a).   "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).   A factual dispute is deemed genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In reviewing the evidence, the court may not weigh the evidence and must give the nonmoving party the benefit of all reasonable inferences.  *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citations omitted); *Bray v. Marriott Hotels*, 110 F.3d 986, 989 (3d Cir. 1997).  Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

---

[7]     Defendants' allegations of fraud, misrepresentations and irregularities in the signature gathering process include, *inter alia,* allegations regarding the form and content of the petitions, the manner in which they were circulated, and the representations made by the circulators during the signature gathering process. (Dkt. No. 61 at 9-13).

As discussed below, the entry of summary judgment in favor of Defendants is appropriate in this matter.

## III.   DISCUSSION

The parties' dispositive motions raise several issues.  First, Plaintiffs argue that because the Board of Elections took no "official action" regarding 1) the determination by the Supervisor of Elections of the signature threshold required by the Revised Organic Act, and 2) the alleged fraud, misrepresentations and other irregularities regarding the collection of signatures for the recall petitions, the Defendants cannot raise those issues in this lawsuit.  Second, Plaintiffs assert that the Board of Elections lacks the authority or jurisdiction to review and overturn the Supervisor of Elections' certification of the recall petitions.  Third, Plaintiffs claim that Defendants' evidence of fraud, misrepresentations and irregularities is insufficient to warrant further review by this Court.  Finally, Plaintiffs and Defendants each contend that they are entitled to summary judgment on their positions regarding the signature threshold required by section 12(c) of the Revised Organic Act.

### A.   "Official Action" by the Board of Elections

In their Motion for Summary Judgment, Plaintiffs contend that because "the Board of Elections as an official entity has taken no official position with respect to this lawsuit," including "whether 'fraud' was used to procure the signatures on the recall petitions," the Board's "answer, denials, counterclaims and affirmative defenses should be stricken."  (Dkt. No. 107 at 10; *see also* Dkt. No. 67 at 5).[8]  While not expressly formulated as such, Plaintiffs' argument that the Board of Elections never took official action regarding the number of

---

[8]      In their "Emergency Motion to Strike 'Affirmative Defenses' and 'Counterclaims,'" Plaintiffs contend that Defendants' fraud allegations should be stricken because they are "an after the fact challenge to the form and content of the recall petitions."  (Dkt. No. 67 at 5).

signatures required to trigger a recall election or the alleged fraud and other irregularities surrounding the recall petitions raises the concept of administrative exhaustion. [9]

Defendant Board of Elections is an administrative body, and judicial review of its actions is guided by principles of administrative review. *See St. Thomas-St. John Board of Elections v. Daniel*, 2007 WL 4901116, at *3 n.7, 49 V.I. 322 (V.I. Sept. 17, 2007) (noting that the Superior Court had dismissed a challenge to the result of an election for lack of "administrative exhaustion" because "the Joint Board had not yet acted on [the challenge.]."); *see also Mitchell v. Cook County Officers Electoral Bd.*, 924 N.E.2d 585, 589 (Ill. Ct. App. 2010) ("Electoral boards are considered to be administrative agencies."). Under the doctrine of administrative exhaustion, "a court should not consider an argument which has not been raised in the agency proceedings . . . absent unusual circumstances." *Director, Office of Workers' Compensation Programs, U. S. Dept. of Labor v. North American Coal Corp*. 626 F.2d 1137, 1143 (3d Cir. 1980). "The primary purpose of the exhaustion doctrine is to permit administrative officials and agencies the opportunity to consider issues and claims and to exercise their discretion before the matter is submitted to the courts." *Goodrich v. U.S. Dept. of the Navy*, 686 F.2d 169, 177 (3d Cir. 1982). [10]  Further, under the doctrine of "finality," only "final orders" of an agency are reviewable. *New Jersey v. U.S. Nuclear Regulatory Com'n*, 526 F.3d 98, 102 (3d

---

[9]  As a variant on this theme, Plaintiffs argue that the members of the Board of Elections inappropriately responded to the Amended Complaint in their individual capacities due to the absence of official action by the Board on the issues raises therein. (Dkt. No. 107 at 10).

[10]  *See also* 73A C.J.S. (Admin. Law) § 341 (2012) ("As a general rule, objections or questions which have not been raised or argued in the proceedings before the administrative agency or body will not be considered by the reviewing court. In the absence of a statute providing otherwise, courts generally consider only such questions, issues, or theories that were raised . . . before the administrative agency or body whose determination is sought to be reviewed . . . ").

Cir. 2008).   A final order "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations."  *Id*.

### 1.   The Supervisor of Elections' Certification Decision

Defendants claim that the April 4, 2012 vote by the Board of Elections to reject the Supervisor of Elections' certification of the recall petitions is sufficient "official action" to allow them to raise their arguments concerning the signature threshold in this case.  The Court agrees.

In the "Statement of Undisputed Material Facts" section of their Motion for Summary Judgment, Plaintiffs stated:

> At the first regular Board meeting, on April 4, 2012 after the Supervisor of Elections certified the recall petitions . . . . Board Member Raymond Williams made a motion to not accept the determination of the Supervisor of Elections, which was seconded by Board Member Ana "Anita" L. Davila . . . . The Four Board Members subject to recall thereafter abstained from voting and the Board approved the measure 2 votes to 1.

(Dkt. No. 107 at 5).  In response, Defendants admitted the truth of these allegations.  (Dkt. No. 119 at 3).  Thus, it is undisputed that the Board of Elections voted at a regular Board meeting to reject the Supervisor of Elections' certification of the recall petitions.

During oral argument, counsel for Plaintiffs argued that the vote to reject the Supervisor of Elections' certification of the recall petitions did not expressly touch on the signature threshold.  When questioned about this contention, Plaintiffs' counsel explained that the Board voted to overturn the Supervisor of Elections' certification because he "flip-flopped" on his position regarding the number of signatures required by section 12(c)(3) of the Revised Organic Act.  According to Plaintiffs' counsel, it is the Supervisor of Elections' action in "flip-flopping," rather than the signature threshold, that the Board voted to reject.

As discussed above, the Supervisor of Elections had initially informed Plaintiffs that the threshold number of signatures for triggering a recall election was fifty percent of the votes cast for all candidates who ran for Board office in the election in which the official whose recall was sought was elected.  However, after consulting with the Attorney General, the Supervisor of Elections adopted a different formula—fifty percent of the votes cast for the individual Board member whose recall was sought—and, applying that threshold, certified that Plaintiffs had gathered sufficient signatures to trigger a recall election for Golden, Davila, James and Harris-Moorhead.  Assuming that the Board voted to reject the certification on the basis of the "flip-flop" as argued by Plaintiffs, when it did so, the Board was essentially taking the position that it agreed with the Supervisor of Elections' initial position on the number of signatures required to trigger a recall election and disagreed with the position that he ultimately adopted.  This is sufficient "official action" to allow the Board to challenge the signature threshold in this case.

Plaintiffs further argued that any action purportedly taken by the Board regarding the threshold number of signatures was procedurally infirm and therefore a nullity because Davila—whom the Supervisor of Elections had determined was subject to a recall election—seconded the motion made at the April 4, 2012 Board meeting to reject the Supervisor of Elections' certification decision.  Defendants acknowledge that Davila seconded the motion.  Plaintiffs maintain that the ensuing vote, which approved that motion, was therefore invalid.

The Joint Board of Elections, which is comprised of members of each District Board of Elections, is responsible for setting policy for the Boards of Election.[11]  The Policies and

---

[11]    *See* 18 V.I.C. § 4(a) ("The Joint Boards shall be the policy-making body of the Virgin Islands Elections System and shall exercise supervisory control through the Supervisor of Elections who shall be responsible for executing the mandates of the Joint Boards."); 18 V.I.C. § 47(13) (in order to "promulgate and issue uniform rules and regulations for the administration

Procedures of the Joint Board of Elections provide that "[n]o Board member will participate in discussions or vote on any action of the Board in which he or she . . . has a personal, professional, business or other financial interest, except as a voter."  (*See* Policy Number B-EM-11(A)(2), August 26, 2005, Dkt. No. 102-1 at 14).  The Joint Board of Elections has also adopted Robert's Rules of Order for conducting official meetings.  (*See* Policy Number B-EM-10(B), August 19, 2004, Dkt. No. 102-1 at 12) ("The Chair is expected to understand and properly use the latest edition of Robert's Rules of Order as a Procedural guide for conducting all Board meeting[s]."); *see also* Ross Dep. Tr. at 36-37, Dkt. No. 90-1).  Section 4 of the 2011 Edition of Robert's Rules of Order provides: "[i]f a motion is considered and adopted without having been seconded—even in a case where there was no reason for the chair to overlook this requirement—the absence of a second does not affect the validity of the motion's adoption."  Henry M. Robert III, et al., Robert's Rules of Order 37 (11th ed. 2011).

Assuming that Davila should not have seconded the motion because of her "personal interest" in the matter—and thus that her seconding of the motion was a nullity—"the absence of a second does not affect the validity of the motion's adoption."  *Id.*  Accordingly, Davila's involvement does not invalidate the vote, or alter the Court's conclusion that sufficient "official action" was taken by the Board to allow it to challenge the signature threshold in this case.

### 2.  Allegations of Fraud, Misrepresentations, and Irregularities

Defendants' allegations concerning fraud, misrepresentations, and irregularities in the signature gathering process are, however, a different matter. Pursuant to Virgin Islands law, the

---

and enforcement of the election laws throughout the United States Virgin Islands . . . the Boards [of Election] shall meet jointly at least quarterly at the call of the Chairman of the Joint Boards, either upon his motion or at the request of the Supervisor of Elections, in order to consider and adopt such rules and regulations.").

Board of Elections "shall . . . perform all duties vested in [the Board] including the duty to . . . . investigate election frauds, irregularities and violations of this title, and report all suspicious circumstances to the Virgin Islands Department of Justice for possible prosecution." 18 V.I.C. § 47(8). Further, the Board of Elections has the authority to "issue subpoenas, summon witnesses, compel production of books, papers, records and other evidence, and fix the time and place for hearing any matters relating to the administration and conduct of . . . elections in the district under the provisions of this title." 18 V.I.C. § 48(a). Moreover, "[n]o official action may be taken by a Board unless at a regular meeting, or a meeting called by the Chairman or by the members of the Board . . ." 18 V.I.C. § 41(h).

Notwithstanding the statutory responsibility with which it is entrusted to investigate fraud and irregularities, and the tools it is authorized to use in doing so, the Board of Elections took no official action regarding its allegations of fraud, misrepresentations, and irregularities in the signature gathering process. (Ross Dep. Tr. at 60, Dkt. No. 90-1). The Board never held a meeting to discuss possible fraud or the alleged misrepresentations or irregularities; it never conducted any official investigation into the alleged wrongdoing; it never convened a hearing to determine whether there was fraud, misrepresentations, or petitioning irregularities; and it never held a vote or made any findings regarding these issues. *Id.*[12]   The failure by the Board of

---

[12]    At the hearing on this matter, Defendants' counsel noted that the Board probably should have investigated the alleged fraud, misrepresentations, and irregularities, but did not do so because of the perceived conflict of interest with the four members of the Board whose recall was sought. However, there is no record evidence that the Board: considered the alleged fraud, misrepresentations, or irregularities at the April 4, 2012 Board meeting or otherwise; considered bringing the matter to the attention of the Joint Board in light of the perceived conflict; or made a decision not to take official action because of the perceived conflict. In any event, the same perceived conflict of interest to which Defendants' counsel refers did not prevent the Board from voting to reject the Supervisor of Elections' certification of the recall petitions. Accordingly, the

Elections to take any official action concerning the allegations of fraud, misrepresentations, and irregularities is fatal to Defendants' attempt to raise those issues before this Court for the first time. *American Coal Corp*., 626 F.2d at 1143; *U.S. Nuclear Regulatory Com'n*, 526 F.3d at 102; *St. Thomas-St. John Board of Elections*, 2007 WL 4901116, at *3 n.7; *see also Hazelwood v. Saul*, 619 P.2d 499, 501 (Colo.1980) (affirming trial court's holding that party contesting finding by county clerk on validity of recall petition could not introduce evidence not presented at hearing before county clerk); *Bryan v. Todman*, 28 V.I. 42, 45, 1992 V.I. LEXIS 19, at *4 (V.I. Terr. Ct. 1992).[13]   Accordingly, the Court finds that the allegations of fraud, misrepresentations, and irregularities in the petition signature gathering process are not properly before the Court.[14]

---

Board's attempt to use its conflict of interest argument as an excuse to avoid its statutory responsibility is unavailing.

[13]     In *Bryan*, the Board addressed allegations of irregularities in the election process, prior to review by the Court.  A candidate who had lost an election filed a complaint with the Board of Elections alleging that the results of the election were invalid because voting machines malfunctioned and voters were improperly prevented from voting. 28 V.I. at 45. The Board of Elections "took oral testimony" and then "issued a final decision on the complaints filed by the plaintiff," finding that "the alleged violations . . . did not affect the results of the . . . election." *Id*.  That decision was then appealed to the Territorial Court of the Virgin Islands (now, the Superior Court). *Id*.  Thus, the Board has previously conducted investigations and made findings in connection with alleged irregularities in the election process.

[14]     Because Defendants' allegations of fraud, misrepresentations, and irregularities regarding the recall petitions are not properly before the Court, the Court will grant Plaintiffs' Motion to Strike Affirmative Defenses and Counterclaim and Plaintiffs' Motion to Dismiss Defendants' Counterclaim regarding these allegations.  In view of the Court's ruling in this regard, the Court need not address whether Defendants have produced sufficient evidence to survive summary judgment on these claims.  The Court notes, however, that it would appear inconceivable that evidence that two individuals with dubious claims of fraud—out of the thousands of people who signed the petitions—would create a genuine issue so as to warrant further review by this Court for an alleged pattern and practice of fraudulent and deceitful conduct.

Further, although the recall section of the Revised Organic Act was passed over 25 years ago, Defendants acknowledged at the hearing on this matter that there are no laws, rules, or regulations governing the gathering of recall petition signatures in the Virgin Islands.  Thus, in asserting their claims of alleged irregularities in the signature gathering process, Defendants

**B.  Authority of the Board of Elections to Review
the Certification Decision of the Supervisor of Elections**

Plaintiffs contend that section 12(c)(3) of the Revised Organic Act—which requires the "Supervisor of Elections . . . to determine whether the minimum number of valid signatures are contained in the recall petition"—supports a finding that it is *only* the Supervisor of Elections who has the authority to make such a determination.  Plaintiffs further maintain that once the Supervisor of Elections has certified a recall petition, the Board has only a *ministerial duty* to set a recall election date.  (Dkt. No. 107 at 11-12). Plaintiffs argue in the alternative that, because the Supervisor of Elections has "15 days in which to determine whether the minimum number of valid signatures are contained in the recall petition," there can be no review by the Board of Elections, if at all, after those 15 days have elapsed.  *Id.*

Defendants argue that sections 4 and 47 of Title 18 of the Virgin Islands Code expressly provide the Board of Elections with the authority to review and overturn the Supervisor of Elections' certification of the recall petitions.  (Dkt. No. 118 at 4-5).  In response to an inquiry by the Court at the hearing, Defendants' counsel further argued that the Board of Elections has a "reasonable" amount of time to review a certification by the Supervisor of Elections, subject to the 60-day time period for holding a recall election.  In other words, Defendants claim that

---

essentially ask this Court to fashion rules and regulations for recall petitions and then apply them to the instant case.  However, it is the Virgin Islands Legislature and the Joint Board of Elections—not this Court—which are the entities empowered to enact laws, rules and regulations regarding the election process in the Virgin Islands.  *See* 48 U.S.C. § 1574(c) ("the [Virgin Islands] legislature shall have power. . . to enact new laws not inconsistent with any law of the United States applicable to the Virgin Islands"); 18 V.I.C. §47(13) (the Joint Board of Elections has the duty "to promulgate and issue uniform rules and regulations for the administration and enforcement of the election laws throughout the United States Virgin Islands.").  It is not the role of the Court to "legislate from the bench."  *Kendall v. Russell*, 572 F.3d 126, 133 (3d Cir. 2009).

section 12(c) allows for Board review so long as the review is completed soon enough after the certification to allow compliance with the 60-day time limit for holding a recall election.

Section 12(c) of the Revised Organic Act—codified at 48 U.S.C. § 1593(c)—provides, in pertinent part:

> (1) An elected public official of the Virgin Islands may be removed from office by a recall election carried out under this subsection . . . .
>
> * * *
>
> (3) Prior to circulation a recall petition which identifies by name and office the official being recalled and which states the grounds for recall shall be submitted to the Supervisor of Elections. The sponsors of the recall petition shall be allowed a period of 60 days after such submission for filing with the Supervisor of Elections a list of signatures equal in number to at least 50 percent of the whole number of votes cast for that office in the last general election at which that office was filled. *The Supervisor of Elections shall have 15 days in which to determine whether the minimum number of valid signatures are contained in the recall petition* . . .
>
> (4) A special recall election shall be held with respect to an elected public official not earlier than 30 days after . . . *a determination of the board of elections under paragraph (3)*, as the case may be, and not later than 60 days after such vote or determination.

48 U.S.C. § 1593(c) (emphasis added).

"In seeking to discern Congressional intent from the legislative text, a court must be mindful of the statute's object and policy and must read the disputed provision in the context of the entire statute *and the provisions of related statutes*." *N.J. Transit Policemen's Benev. Ass'n Local 304 v. New Jersey Transit Corp.*, 806 F.2d 451, 453 (3d. Cir.1986) (emphasis added); *see also Hernandez v. Kalinowski*, 146 F.3d 196, 200 (3d Cir. 1998) ("When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law") (quoting *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974)).

Here, by making explicit reference to the "Supervisor of Elections"—a position that is not defined or described in the Revised Organic Act, but instead was created in the Virgin Islands Elections Code—it is clear that, when Congress enacted section 12 of the Revised Organic Act, it understood that it was legislating within the context of the Virgin Islands Elections Code. [15]  Thus, this Court must consider relevant Virgin Islands law when considering whether Congress intended the Supervisor of Elections to be the sole authority for the certification of recall petitions.  *N.J. Transit Policemen's Benev. Ass'n Local 304*, 806 F.2d at 453; *Hernandez,* 146 F.3d at 200.

Defendants contend that 18 V.I.C. § 4(b)—a statute outlining the authority of the Supervisor of Elections—supports the position that the Board of Elections is empowered to review and reject the Supervisor of Elections' certification of the recall petitions.  Section 4(b) provides, in pertinent part, that "[t]he Supervisor of Elections, *subject to the direction, control and supervision of the boards of elections*, shall exercise all powers granted to, and perform all duties vested in him by this title."  18 V.I.C. § 4(b) (emphasis added).  Defendants argue that this gives the Board "plenary authority" over the Supervisor of Elections.  (Dkt. No. 118 at 5).

"Perhaps the most fundamental principle of statutory construction is that words in a statute must be given their ordinary meaning whenever possible."  *Alaka v. Att'y Gen.*, 456 F.3d 88, 104 (3d Cir. 2006).  Here, the relevant language in 18 V.I.C. § 4(b) is clear and unambiguous.  It provides that the Supervisor of Elections "shall exercise *all* powers granted to . . . him" and "shall . . . perform *all* duties vested in him" within certain statutorily prescribed limits—specifically "*subject to the direction, control, and supervision of the boards of*

---

[15]     S*ee* 18 V.I.C. 4(a) ("There is hereby created and established the Office of Supervisor of Elections.").

*elections*." 18 V.I.C. § 4(b) (emphasis added).  Based on the plain language of the statute, it is therefore undeniable that the exercise of powers and the performance of duties by the Supervisor of Elections can be directed, controlled and supervised by the Board of Elections.  Using the ordinary meaning of the statutory language in 18 V.I.C. § 4(b), the Court thus finds that the Board was empowered—as it did here—to review and reject the interpretation of the signature threshold adopted by the Supervisor of Elections and to overturn the Supervisor of Elections' certification of the recall petitions.

Moreover, Plaintiffs' argument that section 12(c)(3)'s 15-day certification requirement forecloses Board review once that time period has elapsed fares no better.  This time limitation requires the Supervisor of Elections to make his certification decision within 15 days; it does not speak to the Board of Elections' review authority, discussed above.  Further, the Board of Elections has sixty days within which to set and hold the recall election, leaving ample time for an appropriate review.  *See, e.g., Stapleton v. Nyhan*, 3 Mass. L. Rptr. 423, 1995 WL 809921, at *3 (Mass. Super. Ct. Feb. 3, 1995) (reviewing Board of Registrar's decision to decertify a recall petition and noting that Board had conducted "over twenty-two hours of hearing . . . heard from approximately fifty-eight witnesses and received sixty-four exhibits" within thirty days of initial certification of the recall petition).

Here, the Supervisor of Elections made his certification decision on the fifteenth day following the submission of the petitions by the sponsors, which was the statutory deadline.  The Board's review and rejection of the Supervisor of Elections' certification decision at its meeting held eight days later is not unreasonable under the circumstances.

18

In view of the foregoing, the Court finds in favor of Defendants on Plaintiffs' challenge to the Board of Elections' authority to review and reject the Supervisor of Elections' certification of the recall petitions.[16]

### C.  The Signature Threshold for Recall Petitions

The Board of Elections' vote to reject the certification of the recall petitions by the Supervisor of Elections was based on the view that the Supervisor of Elections had used an incorrect threshold for determining whether Plaintiffs had gathered a sufficient number of signatures to trigger a recall election.

The relevant portion of section 12(c) of the Revised Organic Act states as follows:

(3) The sponsors of the recall petition shall be allowed a period of 60 days . . . for filing with the Supervisor of Elections a list of signatures equal in number to *at least 50 percent of the whole number of votes cast for that office in the last general election at which that office was filled*.

48 U.S.C. § 1593(c)(3) (emphasis added).  A related provision of section 12(c), which applies in determining whether a recall election has produced sufficient votes to remove an official from office, provides:

(5) An *official* shall be removed from office upon approval of the recall in an election in which at least two-thirds of the number of persons *voting for such official in the last preceding general election at which such official was elected* vote in favor of recall and in which those so voting constitute a majority of all those participating in such recall election.

48 U.S.C. § 1593(c)(5) (emphasis added).

### 1. The Parties' Initial Positions

In his March 27, 2012 letter, the Attorney General opined that section 12(c)(3), which references "50 percent of the whole number of votes cast for that office in the last general

---

[16]   Because Plaintiffs' Motion for Judgment on the Pleadings was based on the argument that the Board of Elections lacks the authority to review the certification of the recall petitions by the Supervisor of Elections, the Court will deny that Motion.

election at which that office was filled," means fifty percent of the number of votes received by the elected official whose recall is being sought.  Based on that advice, the Supervisor of Elections calculated the number of signatures required to trigger a recall election for an individual member of the Board as half of the number of votes that were cast to elect that *particular Board membe*r, and certified the recall petitions for Golden, Davila, Harris-Moorhead and James on that basis.  Plaintiffs argued in their papers filed with the Court that this is a correct interpretation of section 12(c)(3).  (Dkt. No. 107 at 17-18).

Defendants contend that this interpretation is incorrect because Congress' use of the phrase "*at least 50 percent of the whole number of votes cast for that office in the last general election at which that office was filled*" in section 12(c)(3) and "two-thirds of the number of persons *voting for such official in the last preceding general election at which such official was elected*" in section 12(c)(5) indicates that Congress did not intend that a recall election would be triggered, pursuant to section 12(c)(3), by signatures equal in number to fifty percent of the votes that a *particular Board member* received.  Defendants argue that if Congress had intended that a recall election would be triggered for an elected official based on signatures equal to 50% of the votes for such official in the election at which such official was elected—the formula urged by Plaintiffs—it would have used the word "official" in section 12(c)(3) as it did in section 12(c)(5), not the word "office."  Defendants maintain that, under the canon of statutory construction known as the "presumption against superfluities," the Court should presume that Congress used different language in sections 12(c)(3) and 12(c)(5) because it intended those sections to have different—not the same—meanings.

"[W]here Congress includes particular language in one section of the statute but omits it in another section of the same act, it is generally presumed that Congress acts intentionally and

20

purposely in the disparate inclusion or exclusion." *Ki Se Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004) (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447–48 (1987)).  This principle "applies 'particularly when the two [provisions] are interrelated and closely positioned, both in fact being parts of the same statutory scheme.'" *Id.* (quoting *Doe v. National Bd. of Medical Examiners*, 199 F.3d 146, 155 (3d Cir. 1999)).  In addition, "when interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous." *Birdman v. Office of the Governor*, 677 F.3d 167, 176 (3d Cir. 2012) (quoting *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001)).  "[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Defendants make a compelling argument that in equating the phrase "that office" in section 12(c)(3) with "such official" as used in section 12(c)(5), Plaintiffs' interpretation runs afoul of the presumption against superfluities and ignores the plain language of the statute. Congress could have set the recall threshold in section 12(c)(3) as "signatures equal in number to at least 50 percent of . . . *the number of persons voting for such official in the last preceding general election at which such official was elected*" as it did with the language in section 12(c)(5).  Instead, however, Congress used different language—"signatures equal in number to at least 50 percent of *the whole number of votes cast for that office in the last general election at which that office was filled.*"  48 U.S.C. § 1593(c)(3) (emphasis added).  Under the presumption against superfluities, the Court cannot ignore the fact that the statute uses "that office" in section 12(c)(3) and "such official" in section 12(c)(5).  *See In re Visteon Corp.*, 612 F.3d 210, 223-24 (3d Cir. 2010) ("A fundamental canon of statutory construction is that where a section of a

21

statute does not include a specific term or phrase used elsewhere in the statute, the drafters did not wish such a requirement to apply.") (citations omitted).  Notwithstanding the difference in language between sections 12(c)(3) and 12(c)(5), Plaintiffs' interpretation of section 12(c)(3) would ignore that difference and interpret the language of each section as if they were identical.

If considered in a vacuum, section 12(c)(3) might possibly be construed as suggested by Plaintiffs.  However, "the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993) (noting that the word "conviction" has many meanings, "all but one of [which] is ordinarily eliminated by context."); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."); *B & G Const. Co., Inc. v. Director, Office of Workers' Compensation Programs*, 662 F.3d 233, 264 (3d Cir. 2011) (Hardiman, J. concurring) ("[R]eading a statute in a vacuum is improper, and we must consider the context of each statute we interpret.").[17]

Consistent with the principles of statutory construction discussed above, section 12(c)(3) must be read in the context of the entire statute—including section 12(c)(5).  *Deal*, 508 U.S. at

---

[17]     In the March 27, 2012 letter sent to Defendant Ross, the Attorney General stated that the word "office" as used in section 12(c)(3) was "ambiguous" because it "had seven definitions" according to the Merriam-Webster dictionary.  (Dkt. No. 32-10 at 3).  However, the "approach to discerning the existence of ambiguity . . . based on dictionary definitions . . . [is] insufficient . . . . [T]he text of a statute must be considered in the larger context or structure of the statute in which it is found."  *Alli v. Decker,* 650 F.3d 1007, 1012 (3d Cir. 2011) (citations and internal quotations omitted); *see also Brown v. Gardner,* 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context."); *Deal,* 508 U.S. at 132 (noting that the word "conviction" has at least five dictionary meanings, but was not ambiguous when read in context of statute at issue).

132; *Ki Se Lee*, 368 F.3d at 223.   The Court must interpret the statute to give meaning to all of its words. *Birdman,* 677 F.3d at 176.   Because the threshold formula urged by Plaintiffs (and applied by the Supervisor of Elections) ignores the clear difference between the language used by Congress in sections 12(c)(3) and 12(c)(5)—two paragraphs within the *same section of the statute*—Plaintiffs' argument must be rejected.   Thus, the Court finds that signatures in number equal to at least 50% of the votes received by *the particular official* sought to be recalled—the basis upon which the recall petitions were certified by the Supervisor of Elections—is not the correct measure to trigger a recall election.   *Id*.

The question remains as to what is the correct interpretation of the signature threshold statute.   Defendants argue that, consistent with the position taken by the Supervisor of Elections in his January 17, 2012 letter, the requisite number of signatures must be calculated as 50% of *all the votes cast for all candidates for Board of Elections positions* in the election in which the specific board member was elected. (Dkt. No. 104 at 9-10).   This interpretation would result in the need to collection 8,991 signatures each, for Davila, James, Golden and Harris-Moorhead to trigger a recall election for the particular Board member.   Plaintiffs respond that this is an "absurd" result, and thus could not be the construction intended by Congress. (Dkt. No. 107 at 19).

"Where the literal reading of a statutory term would compel an odd result, [a court] must search for other evidence of congressional intent to lend the term its proper scope." *Public Citizen v. United States Dept. of Justice*, 491 U.S. 440, 454 (1989) (internal quotations omitted); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Disabled in Action of Penn. v.*

*Southeastern Penns. Transp. Auth.,* 539 F.3d 199, 210 (3d Cir. 2008) ("We also consider the overall object and policy of the statute . . . and avoid constructions that produce odd or absurd results or that are inconsistent with common sense.") (internal quotations omitted) (citing *Public Citizen v. United States Dept. of Justice*, 491 U.S. 440, 454 (1989) and *United States v. Schneider*, 14 F.3d 876, 879 (3d Cir. 1994)); *In re Kaiser Aluminum Corp*., 456 F.3d 328, 338 (3d Cir. 2006) ("[C]ourts should interpret a law to avoid absurd or bizarre results.") (citing *Demarest v. Manspeaker*, 498 U.S. 184, 191 (1991)).

Here, Defendants' proffered interpretation for the threshold number of signatures would require that Plaintiffs obtain 8,991 signatures to recall James, Harris-Moorhead, Davila, and Golden, who were elected based on 4,247, 3,086, 3,553 and 3,678 votes, respectively.  (*See* Dkt. No. 1-2 at 4).  The practical result of this threshold—over *twice* as many signatures as votes received by James and nearly *three* times more signatures than votes received by Harris-Moorhead—casts significant doubt on whether such a result was intended by Congress.  Any doubts, however, are confirmed by applying Defendants' interpretation to a hypothetical recall of members of the Virgin Islands Legislature.  Plaintiffs demonstrate that when this formula is applied to members of the Legislature elected in 2010, unquestionably absurd results obtain.  For example, to trigger a recall election for a senator elected from St. Croix in 2010, the Defendants' position would require a recall petition containing 44,427 signatures, despite the fact that elected Senators received between 5,437 and 8,575 votes; only 17,449 voters participated in the election; and there were only 25,307 registered voters on St. Croix during the 2010 election. (*See* Dkt. No. 120 at 6; *see also* Dkt. No. 1-2 at 5).  Obviously, Congress did not intend that a recall election for a single senator would require tens of thousands more signatures than the number of registered

voters on St. Croix.  As this interpretation forecloses even the possibility of a recall of these officials, it must be rejected.  *In re Kaiser Aluminum Corp.*, 456 F.3d at 338.

So, once again, the question remains as to what is the correct interpretation of the signature threshold statute.  As discussed below, the Court deems it helpful to separate the analysis into two parts—first, the interpretation of "at least 50 percent of the whole number of votes cast for that office;" and second, the interpretation of "the last general election in which that office was filled."

### 2.  Interpretation of
#### *"at least 50 percent of the whole number of votes cast for that office"*

When there is no case construing the statute at issue, courts may look for guidance to cases from other jurisdictions interpreting similar statutes.  *Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 564 (3d Cir. 1998) (looking to First Circuit's interpretation of a similar Maine statute to construe a New Jersey statute for which there was no New Jersey precedent); *Algrant v. Evergreen Valley Nurseries Ltd. Partnership*, 126 F.3d 178, 186 (3d Cir. 1997) (noting that district court correctly applied case law interpreting federal statute in construing Pennsylvania Unfair Trade Practices and Consumer Protection Law).

The parties' and this Court's research has revealed only one other case—*Johnson v. Maeling*, 597 P.2d 1 (Ariz. 1979)—in which a court was faced with a similar question regarding the number of signatures required to trigger a recall election when the official sought to be recalled was elected in an election in which more than one seat was filled, and voters were therefore allowed to vote for more than one candidate.  *Id.* at 3.  In *Johnson*, two school board members, Baker and Dennis, who were the subjects of a recall attempt, had been elected simultaneously in an election where two board seats were filled.  *Johnson*, 597 P.2d at 3.  They

25

asserted that, pursuant to the constitutional provision at issue, the threshold number of signatures to trigger a recall election should be 25% of "the total number of votes cast for all candidates in the election" in which they were elected.  *Id.*[18]

The court rejected this argument, noting that: "In those instances in which voters are permitted to vote for more than one candidate to fill several offices (school board, city council, etc.) the literal application sought by appellant causes an absurd result." *Id.* at 3-4. The Court continued:

> In those instances in which voters are permitted to vote for more than one candidate to fill several offices . . . the proper method of calculating the number of signatures required for a recall is to *divide the total number of votes cast for all candidates by the number of offices to be filled at that election*. It is readily conceded that the resulting number is an approximation because some voters may have chosen to cast one vote for a single candidate. We believe, however, that out of necessity and fairness the foregoing formula is more in harmony with the constitutional intent.

*Id.* at 4 (emphasis added).[19]

The Court finds that the *Johnson* court's formulation reasonably satisfies the legislative purpose behind section 12(c) of the Revised Organic Act.  By using the number of votes for all

---

[18]    The constitutional provision at issue provided:

> Such number of said electors as shall equal twenty-five per centum of the number of votes cast at the last preceding general election for all of the candidates for the office held by such officer, may by petition, which shall be known as a recall petition, demand his recall.

Ariz. Const. art. 8 pt. 1 § 1.

[19]    At least one jurisdiction has statutorily adopted this approach for recall elections.  *See* Colo. Rev. Stat. § 1-12-104 (2012) ("If more than one person is required by law to be elected to fill the office to which the person sought to be recalled is an incumbent, then the petition shall be signed by eligible electors entitled to vote for a successor to the incumbent sought to be recalled equal in number to twenty-five percent of the entire vote cast at the last preceding general election for all candidates for the office to which the incumbent sought to be recalled was elected, *the entire vote being divided by the number of all officers elected to the office at the last preceding general election*.") (emphasis added).

candidates, including those who did not prevail, this interpretation gives meaning to the phrase in section 12(c)(3) that the number of signatures required is "50 percent of the *whole number of votes cast for that office,*" rather than signatures equal to 50 percent of "the number of persons voting for such official" as urged by Plaintiffs. At the same time, by dividing the number of votes by the number of positions filled, this takes into account—and adjusts for the fact—that each voter is allowed to vote for more than one candidate, and there are thus many more votes than individuals voting. This approach avoids the absurd result of the literal interpretation urged by Defendants. Although this interpretation involves an element not present in the text of the statute—dividing by the number of positions filled—the *Johnson* formula harmonizes sections 12(c)(3) and 12(c)(5) and is consistent with the legislative purpose. *See Griffin,* 458 U.S. at 575; *Disabled in Action of Penn.,* 539 F.3d at 210. Accordingly, the Court finds that the approach adopted by the *Johnson* court should be applied in calculating the signature threshold to trigger a recall election under section 12(c)(3) of the Revised Organic Act.

### 3.   Interpretation of
#### "*the last general election in which that office was filled*"

In response to the Court's inquiries regarding their respective positions at oral argument, the parties abandoned their initial positions and agreed that the *Johnson* approach should be applied in interpreting the portion of section 12(c)(3) that refers to "at least 50 percent of the whole number of votes cast for that office." The parties differed, however, in their positions on the last remaining issue—interpretation of the clause in section 12(c)(3) which refers to "the last general election in which that office was filled."

As it turns out, resolution of this latter issue is dispositive of this case, and each party advocated for the position that provides the same ultimate result as their initial positions. If the

signature threshold is calculated based on the number of votes cast for the office of Board of Elections in 2008—the year in which the recall targets were elected—Plaintiffs have obtained sufficient signatures to trigger a recall election.  On the other hand, if the number of votes cast for the office of Board of Elections in 2010 is the proper metric, Plaintiffs have not gathered sufficient signatures.  That said, this Court's role is simply to interpret the law based on the statute's language, not on which party wins or loses as a result of that construction.

"As in all cases of statutory construction, [the Court's] analysis . . . begins with the statute's plain language."  *In re Visteon Corp.,* 612 F.3d 219.  According to section 12(c)(3), the election from which the signature threshold must be based is "the last general election at which that office was filled."  48 U.S.C. § 1593(c)(3).  Defendants argue that this refers to the last election at which any Board member was elected, even though the recall targets were elected in a prior election.  Applied to this case, that would require using the results of the 2010 general election to determine the threshold for triggering a recall of Board members elected in 2008.  In support of this argument, Defendants again rely on the statutory language and claim that if Congress had intended to refer in section 12(c)(3) to the election in which the official was elected, the language would read "in the last preceding general election *at which such official was elected*" as it does in section 12(c)(5), instead of "in the last general election *at which that office was filled.*"

For the same reasons that the Court rejected Plaintiffs' argument that the threshold number is fifty percent of the votes received by the individual Board members, the Court finds that the plain language of section 12(c)(3) requires that the signature threshold must be based on the most recent election in which any Board member was elected.  As evident from the language of section 12(c)(5), Congress clearly knew how to refer to "the last preceding general election *at*

28

*which such official was elected.*"  If it had intended that to be the election from which the signature threshold was generated, it could easily have chosen such language.  Instead, it chose the language "in the last general election *at which that office was filled.*"  The Court is not free to ignore this obvious difference in the language chosen by Congress.  *Ki Se Lee*, 368 F.3d at 223; *Birdman,* 677 F.3d at 176.   Thus section 12(c)(3) requires that the threshold number be calculated based on the most recent election in which a Board member was elected—which is 2010.

Although there is, once again, a dearth of case law in this area, the Court's construction of section 12(c)(3) nonetheless finds support in a 1914 case from the state of Washington.  In *Mills v. Nickeus*, 142 P. 1145 (Wash. 1914), cited by Defendants, the Supreme Court of Washington addressed a recall statute which stated:

> Every elective public officer in the state of Washington except judges of courts of record is subject to recall and discharge by the legal voters of the state, or of the political subdivision of the state, from which he was elected whenever a petition demanding his recall . . . signed by the percentages of the qualified electors thereof, hereinafter provided, *the percentage required to be computed from the total number of votes cast for all candidates for his said office to which he was elected at the preceding election*, is filed. . . . The percentages required shall be . . . twenty-five percent.

*Id*. at 1146 (emphasis added).

Mills was elected as a city councilman in April of 1912.  *Id*. The city council consisted of four members, and like the Board of Elections here, each member served a four-year term and was elected at staggered elections held every other year.  *Id.*  In April of 1914, there was another election for city council.  Dissatisfied voters sought to recall Mills and filed a recall petition with the city clerk in June of 1914.  Upon review of the recall petition, the trial court determined that the petitions contained signatures equal to at least 25% "of the number of votes cast for councilman at the general municipal election of *April, 1912*," and thus determined that a recall

election was appropriate.  *Id.* (emphasis added).  Notably, had the trial court determined that the 1914 election was the proper basis for the signature threshold, the recall petition would have failed. *Id.*  Mills appealed, arguing that the proper measure should have been based on the 1914 election.

Noting that "the matter [wa]s not free from difficulty," the Washington Supreme Court reversed the trial court, finding that "his said office to which he was elected at the preceding election" meant "a general designation of the office, held not only by him but by his associates." *Id.* at 1147.  The court continued:

> Looking to the evident purpose and spirit of this constitutional provision, we think it is manifest that it evidences an intent to measure the number of required signatures upon a recall petition by the required percentage of the number of votes cast at the nearest preceding election, and to have the question of whether there shall be a recall election or not decided by the required percentage of present qualified voters, as near as that can be ascertained. Plainly the record of the last preceding election furnishes a more nearly correct measure of the present number of qualified voters than does the record of any prior election. Clearly it is in keeping with the spirit of our government by the people that, when a question of public concern is to be decided by a majority or certain percentage of the qualified voters of the state or any legal subdivision thereof, it is to be decided by such percentage of the present qualified voters as nearly as that can be ascertained. Having these considerations in view, we are led to the conclusion that the intent and spirit of the Constitution is to require signatures upon these petitions equaling 25 per cent of the number of votes cast at the last preceding election held for the election of councilmen, being the 1914 election.

*Id.*  Accordingly, *Mills* supports using the results from the most recent election in which Board members were elected, which is the 2010 election.

At the June 29, 2012 hearing on this matter, Plaintiffs argued that basing the recall threshold on the most recent election will arbitrarily reflect a "surge in voter participation." However, the court in *Mills* noted that using the most recent election results as a basis for the signature threshold reflects a policy that recall of an elected official *should* be based on current

30

political will, even if that includes increased voter participation.  *Id*.  Thus, there is legitimacy to

the position that Congress' use of the phrase "*in the last general election at which that office was*

*filled*" reflects a deliberate policy choice that the signature threshold is meant to capture recent

voter participation.

Finally, Plaintiffs contend that the plain language of section 12(c)(3) may be ignored in

favor of their suggested interpretation because using the 2010 election to calculate the signature

threshold will require that Plaintiffs obtain more signatures than votes received by three of the

Board members whose recall is sought, which they maintain is an "absurd result."  "[O]nly

absurd results and the most extraordinary showing of contrary intentions justify a limitation on

the plain meaning of the statutory language."  *First Merchants Acceptance Corp. v. J.C.*

*Bradford & Co.*, 198 F.3d 394, 402-403 (3d Cir. 1999) (quotations omitted).  An "absurd result"

is one that is "demonstrably at odds with the intentions of its drafters . . . or an outcome so

bizarre that Congress could not have intended it." *In re Visteon Corp.,* 612 F.3d at 226 (citing

*Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003)).  "This doctrine does not license courts to

improve statutes . . . substantively, so that their outcomes accord more closely with judicial

beliefs about how matters ought to be resolved." *Jaskolski v. Daniels*, 427 F.3d 456, 461 (7th

Cir. 2005).

While the interpretation of section 12(c)(3), discussed above, that resulted in a recall

petition threshold of nearly *three* times more signatures than votes received by one Board

member and an impossible threshold for senators elected in 2010 created an "absurd result," the

same cannot be said here simply because using the 2010 election would require signatures equal

to 90-124% of the votes cast for the Board members.[20]  The result complained of by Plaintiffs is neither "demonstrably at odds" with the intent of the statute nor "so bizarre" that it could not have been intended.  *In re Visteon Corp.,* 612 F.3d at 226.  As discussed above, using the results of the most recent election in which Board members were elected reflects a Congressional policy of basing the signature threshold on *current* political will among voters. *Mills*, 142 P. at 1147. Over 2,400 more voters turned out for the 2010 election as compared with the 2008 election, and over 5,000 more votes were cast in 2010 for the office of member of the Board than in 2008. (*See* Dkt. No. 120 at 6; *see also* Dkt. No. 1-2 at 5).  The higher signature threshold required when the 2010 election is used as the basis reflects this increased voter participation.  Although the wisdom of a policy allowing a situation wherein more signatures than votes received by a candidate are required to trigger a recall election may be subject to debate, the court is "not at liberty to ignore the unambiguous mandate of this statute, nor [is it] free to re-evaluate the relative burdens and benefits of a balance that Congress has struck." *Sea-Land Service, Inc. v. Barry*, 41 F.3d 903, 910 (3d Cir. 1994); *see also National Federation of Independent Business v. Sebelius*, __S.Ct.__  2012 WL 2427810, at *8 (U.S. 2012)  (courts "are vested with the authority to interpret the law; [they] possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders . . .").

Moreover, it is apparent that the result complained of by Plaintiffs—where more signatures may be required than votes received in particular instances—is largely a function of

---

[20]      When the *Johnson* approach adopted above is applied to the election results from 2010, the threshold number of signatures required to trigger a recall election for any Board member is 3,831.  This represents between 90% and 124% of the number of votes cast for Golden, James, Davila, or Harris-Moorhead in the 2008 election. (*See* Dkt. No. 120 at 6; *see also* Dkt. No. 1-2 at 5).

the 50% threshold set by Congress.[21] The fact that Congress set such a high threshold indicates that it intended the number of signatures required to trigger a recall election to be significantly more than in other jurisdictions.[22]   Thus, a signature threshold equal to—or even 24% more than—the number of votes received by the official whose recall is sought is not an "absurd result" sufficient to warrant departing from the plain language of the statute.

"It is for Congress, not the courts, to enact legislation. When courts disregard the language Congress has used in an unambiguous statute, they amend or repeal that which Congress enacted into law. Such a failure to defer to the clearly expressed statutory language of Congress runs contrary to the bedrock principles of our democratic society." *In re Visteon Corp.,* 612 F.3d at 220.

---

[21]     That this is so is confirmed by applying the *Johnson* approach, as advocated by Plaintiffs, to Plaintiffs' hypothetical recall of St. Croix senators elected in 2010. Because senators are elected every two years, there is no debate over which election year is the basis for the recall petition signature threshold. Applying *Johnson* to the 88,853 votes cast for the office of senator in 2010 would yield a threshold requirement of 6,346 signatures to trigger a recall election for any one of the seven senators elected.  (*See* Dkt. No. 1-2 at 3).   However, the two senators elected with the lowest number of votes received 5,511 and 5,437 votes, which is below the 6,346 signature threshold.  *Id.*  In other words, applying *Johnson* in the manner advocated by Plaintiffs—based on the year the official was elected—would nonetheless lead to a result in some instances wherein more signatures than votes received by a senator are required to trigger a recall election. This highlights the fact that such a result is largely a function of the 50% threshold set by Congress, which undermines Plaintiffs' claim that this is an absurd result that justifies a departure from the plain language of the statute.  *In re Visteon Corp.,* 612 F.3d at 226.

[22]     The 50% threshold required to trigger a recall election is among the highest recall petition signature thresholds that this Court's research has uncovered.  *See, e.g.,* Ala. Code § 11-44E-168 (2012) (30%); Alaska Stat. § 15.45.610 (2012) (25%);  Ariz. Rev. Stat. § 19-201(A) (2012) (25%);  Cal. Const. Art. 2, § 14 (12%-20%, depending on office); Colo. Rev. Stat. § 1-12-104 (2012) (25%);  D.C. Const., Article XV (25%);  Fla. Stat. § 100.361 (2012) (30%); [Guam] 48 U.S.C. § 1422a (2012) (50%); La. Rev. Stat. Ann. § 18:1300.2 (2012) (33⅓%); Minn. Const. Art. 8, § 6 (25%); Neb. Rev. Stat. § 32-1303 (2012) (25-45%, depending on office);  Nev. Const. Art. 2 § 9 (25%); R.I. Const. Art. 4, § 1 (15%); S.D. Codified Laws § 9-13-30 (2012) (15%); Wash. Rev. Code § 29A.56.180 (2012) (25-35%, depending on office).

Consistent with that "bedrock principle," the Court finds that the plain language of section 12(c)(3) requires that the signature threshold be calculated based on the most recent election in which members of the Board of Election were elected into office, which is the 2010 general election.  As it is undisputed that Plaintiffs have not gathered sufficient signatures to trigger a recall election for Golden, Davila, James, and Harris-Moorhead using the 2010 election results, the Court finds that judgment must be entered in favor of Defendants on the claims made by Plaintiffs in their Amended Complaint.

### IV.   <u>CONCLUSION</u>

For the reasons discussed above, the Court finds that Plaintiffs have not gathered the number of signatures required by section 12(c)(3) of the Revised Organic Act to trigger a recall election for the members of the Board of Elections whose recall is being sought in this lawsuit. Accordingly, on that basis, the Court will grant Defendants' Motion for Summary Judgment and dismiss Plaintiffs' Amended Complaint with prejudice.  An appropriate Order accompanies this Memorandum Opinion.


Date: July 17, 2012                              _____/s/_____
                                                WILMA A. LEWIS
                                                District Judge